IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL A. RUGGIERI, ESQUIRE | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| RAYMOND J. QUAGLIA, et al. | : | NO. 07-CV-756 |
| | : | |
| Defendant | : | |

MEMORANDUM OPINION

TIMOTHY R. RICE                                                                                      December 24, 2008
U.S. MAGISTRATE JUDGE

      This Motion for Summary Judgment arises from an action initiated by Michael A. Ruggieri, Esquire on February 28, 2007 to collect pension benefits under his Defined Benefit Plan, a plan covered by the Employee Retirement Income Security Act ("ERISA"). Ruggieri filed claims against his former employer, Raymond J. Quaglia, Esquire and Raymond J. Quaglia P.C. (collectively referred to as "Quaglia"), Pension Administration Services, Inc. ("PAS"), and Stephen H. Rosen & Associates ("Rosen"). Ruggieri withdrew his claim against PAS and Rosen and settled with Quaglia, effectively removing Ruggieri from the case. Quaglia asserted crossclaims against PAS and Rosen, which form the basis of this summary judgment motion.

      Quaglia claimed it could not pay Ruggieri because PAS and Rosen did not send the pension benefit amount or the necessary releases to allow payment from the Plan. See Quaglia's Memorandum of Law Contra Crossclaim Defendants' Motion for Summary Judgment at 2, Ruggieri v. Quaglia, No. 07-756, (E.D. Pa. filed Sept. 23, 2008) [hereinafter "Reply Brief"].

1

Quaglia seeks contribution for, or indemnity from, any loss caused by the alleged negligence of PAS and Rosen, see Quaglia's Amended Answer ¶ 49-50, Ruggieri v. Quaglia, et. al., No. 07-CV-756, (E.D. Pa. filed Jan. 22, 2008) [hereinafter Amended Answer], i.e., from the $7,556.43 paid in additional benefits and the $25,000.00 in attorney fees paid by Quaglia to Ruggieri. See Reply Brief at 11.

Although this case implicates several novel legal issues, I need not resolve them because Quaglia is not entitled to relief as a matter of law under any theory. For the following reasons, I grant summary judgment in favor of PAS and Rosen.

I.   Background

The evidence will be viewed in the light most favorable to Quaglia, the non-moving party. See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Between 1986 and 2005, Ruggieri worked as an attorney at Raymond J. Quaglia, P.C., a small law firm. See Amended Complaint ¶ 5, Ruggieri v. Quaglia, et. al., No. 07-CV-756, (E.D. Pa. filed Dec. 18, 2007) [hereinafter Amended Complaint]; Amended Answer ¶ 5. Ruggieri participated in the Raymond J. Quaglia, Esq. P.C. Defined Benefit Plan ("the Plan"),[1] which entitled him to pension benefits. See Motion for Summary Judgment of Defendants Pension Administration Services, Inc. and Stephen H. Rosen & Associates, Inc. to Dismiss Cross-Claim of Raymond J. Quaglia, Esquire and Raymond J. Quaglia Esq. P.C. Defined Benefit Pension Plan [hereinafter "Summary Judgment Motion"], at Ex. A [hereinafter "Dep. of Raymond J. Quaglia"], at 22:19-23.

---

[1] The exact date Ruggieri started participating in the Plan is unclear; however, it occurred shortly after he began working for Raymond J. Quaglia, P.C.

Quaglia was the Plan's trustee and admits Plan documents described him as the Plan Administrator. See Dep. of Raymond J. Quaglia, at 92:10-11, 1-5; Dep. of Raymond J. Quaglia, Ex. 48, at 1-2 [hereinafter "Summary Plan Description"].  The Plan's trustee is responsible for making "all benefit payments from the trust fund to participants" and the Plan Administrator's duties include providing participants with "information regarding [their] rights and benefits under the Plan." See Summary Plan Description, at 1-2.

PAS, a Pennsylvania corporation, see Summary Judgment Motion, at Ex. F, Declaration of Stephen H. Rosen [hereinafter "Rosen Declaration"], at ¶ 2, provided pension support services for clients, including calculating pension distribution values for benefit plan participants and making mandatory federal filings on behalf of clients, see Summary Judgment Motion, at Ex. D, Unsworn Declaration of Patrick Connor [hereinafter "Connor Declaration"], at ¶¶ 2-3.  PAS provided these services to Quaglia from 1985 to 2006.  See Reply Brief, at Ex. D, Sworn Declaration of Raymond J. Quaglia, Esquire [hereinafter "Quaglia Declaration"], at ¶ 1-3.

In 1999, Quaglia terminated the Plan and PAS assisted with this termination.  See Dep. of Raymond J. Quaglia, at 33:1-3; Connor Declaration, at ¶ 10.  In a June 27, 2000 letter to Quaglia, Michael Bluestein, the President of PAS, confirmed PAS should proceed with the termination of the Plan and outlined the termination process.  See Dep. of Raymond J. Quaglia, at Ex. 34.  He suggested Quaglia should not distribute any funds from the Plan until the Internal Revenue Service ("I.R.S.") approved the termination.  Id. (recommending Quaglia "not distribute any funds from the plan until the IRS approval is received" and firmly reiterating that he "not distribute any assets from the plan until [they] receive IRS approval").  Bluestein also specified PAS's fees for "obtaining the necessary approvals and . . . arranging distribution of plan assets." Id.

3

On November 21, 2001, in a "Letter of Determination," the I.R.S. confirmed the termination of the Plan.  See Dep. of Raymond J. Quaglia, at Ex. 24.  Upon formal termination, Quaglia was required to adhere to annual federal filings, with which PAS attempted to assist him.  Id.; Dep. of Raymond J. Quaglia, at Ex. 34.  PAS sent multiple letters to Quaglia requesting information to properly terminate the Plan, calculate the participants' benefits, and file the appropriate governmental forms.  See Dep. of Raymond J. Quaglia, at Exs. 34-46.  Quaglia failed to submit the necessary documents and information to PAS, which delayed PAS's ability to perform an annual review and employee certificates.[2]  See Dep. of Raymond J. Quaglia, at Exs. 39-42; see also Connor Declaration, at ¶ 12.

In 2005, National Investment Managers ("NIM") acquired PAS.  See Rosen Declaration, at ¶ 13.  In an April 10, 2006 letter to Quaglia, Bluestein announced his retirement from PAS and offered the assistance of Rosen to service Quaglia's Plan.  See Dep. of Raymond J. Quaglia, at Ex. 32.   Accompanying this letter was a letter sent by Rosen to Quaglia welcoming Quaglia to the Rosen firm [hereinafter "Welcome Letter"].

In December 2005, after NIM acquired PAS, but before PAS ceased its business operations, Ruggieri ended his employment with Quaglia P.C.  See Quaglia Declaration, at ¶ 11; Reply Brief, at Ex. E.  In early 2006, based on information available to him at the time, Patrick Connor, a pension administrator at PAS, calculated the estimated distributions to Plan participants as of June 30, 2005 and sent these calculations to Quaglia.  See Dep. of Raymond J. Quaglia, at

---

[2] Quaglia contends he was late with the yearly information because the plan year ended on June 30, but the bank did not compute the interest until the end of the year.  See Quaglia's Reply at n.3.  Regardless, the responsibility for the delay in yearly filings is irrelevant to Ruggieri's claim for benefits, which is the subject of Quaglia's contribution and indemnity actions.

7:21-24, 8:1-24, 9:1-20; Reply Brief, at Ex. C; Connor Declaration, at ¶ 13. Connor requested Quaglia inform him if the "numbers are acceptable" and, if so, Connor would "begin the process of sending out the first letters to the participants." See Reply Brief, at Ex. C.[3] On April 28, 2006, Quaglia sent a letter to Connor informing him Ruggieri had quit and requested Ruggieri's pension benefits be transferred to Ruggieri. See Dep. of Raymond J. Quaglia, at Ex. 20. In the letter, Quaglia asked Connor to "begin the process of distributing the plan as per your earlier correspondence." See id. Neither Quaglia nor Connor distributed the amounts.[4]

On August 14, 2006, after not hearing from either party, Ruggieri, through his attorney, formally requested the benefits due to him under the Plan from Quaglia, PAS, and Rosen. See Reply Brief, at Ex. E. In a December 18, 2006 letter addressed to Quaglia, Damien Callahan, a senior pension analyst at Rosen, emphasized Rosen could not properly calculate Ruggieri's benefit payment until Quaglia sent Rosen the necessary insurance information. See Dep. of Raymond J. Quaglia, at Ex. 27. In that letter, Callahan referenced a December 11, 2006 telephone conversation with Quaglia, during which they discussed the importance of receiving the insurance documents. See id.; Dep. of Raymond J. Quaglia, at 47:11-24, 48:1-18. Callahan also sent a follow-up letter on December 27, 2006, reiterating a request for the same information. See Dep. of Raymond J. Quaglia, at Ex. 29. In early January 2007, Callahan and Quaglia scheduled a

---

[3] It is unclear whether Quaglia approved the amounts Connor sent to him. Compare Dep. of Raymond J. Quaglia, at 9:19-20 with Connor Declaration, at ¶ 15.

[4] Quaglia, and not Connor or PAS, maintained responsibility to distribute benefits to the Plan participants. See Summary Plan Description, at 2. ("[T]he Trustee [Quaglia] will make all benefit payments from the trust fund to participants and beneficiaries."). Additional evidence of this responsibility is found in the letter from Bluestein to Quaglia regarding the necessary compliance with the I.R.S. for terminating the Plan. Bluestein made clear it was Quaglia's responsibility to distribute the funds. Dep. of Raymond J. Quaglia, at Ex. 34 (suggesting Quaglia "not distribute any funds from the plan until the IRS approval is received" and firmly reiterating that he "not distribute any assets from the plan until [they] receive IRS approval").

meeting to discuss this outstanding issue.  The meeting never occurred.  See Dep. of Raymond J. Quaglia, at 126:5-17; Summary Judgment Motion, at Ex. E, Declaration of Damien Callahan [hereinafter "Callahan Declaration"], at ¶ 16; Callahan Declaration, at Ex. E-2.  On January 3, 2007, Rosen sent an engagement letter to Quaglia to retain Rosen's services.  See Dep. of Raymond J. Quaglia, at Ex. 30.; id. at 41:24, 42:1-2.  Quaglia, however, never retained Rosen.  Id. at 46:14-18, 63:5-11.

On February 28, 2007, Ruggieri filed a lawsuit against Quaglia, PAS, and Rosen, claiming they failed to distribute his pension benefits due under ERISA.  See Amended Complaint, at ¶¶ 26-27.  On April 9, 2007, Quaglia sent a letter to Ruggieri's attorney stating the value of the Plan's insurance policy.  See Dep. of Raymond J. Quaglia, at Ex. 28.  Quaglia also stated he stopped attempting to work with Rosen after Ruggieri filed the lawsuit.  See Dep. of Raymond J. Quaglia, at 23:17-24, 24:1-8, 53:11-12.

Ruggieri dismissed his claim against PAS and Rosen and, on February 13, 2008, I entered a stipulation of dismissal.  During a bench trial ending on May 6, 2008, Quaglia and Ruggieri reached a settlement and Quaglia agreed to pay Ruggieri the amount due to him under the Plan and attorney's fees.  As a result, on August 4, 2008, I dismissed Ruggieri's claim against Quaglia.

Quaglia, however, maintains a crossclaim against PAS and Rosen, alleging they were negligent in "administering the plan" and failing to "timely distribute the proceeds" to Ruggieri.  See Amended Answer, at Crossclaims ¶ 49.  Quaglia argues that as a result of the negligence, PAS and Rosen owe contribution and/or indemnity to Quaglia to the extent Quaglia was liable to Ruggieri for additional benefits and attorney fees because of the delay in distributing Plan

benefits.[5]  See id. at ¶ 50.  Quaglia claimed he relied on the expertise of PAS and Rosen to terminate the Plan and Connor's promise to send the necessary letters and distribute Ruggieri's benefits.  See Reply Brief at 11.  Quaglia claims PAS and Rosen breached the duty of good faith and fair dealing implied in every contract and as a result of their negligence or self-dealing, Quaglia had to defend the lawsuit.  Id.  The parties both rely on Pennsylvania law as controlling the state law claims.  See Summary Judgment Motion at 12-14; Reply Brief at 9-15.

II.     Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing the record reveals no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The party opposing summary judgment, however, "must do more than simply show that there is some metaphysical doubt as to the material facts;" it must produce competent evidence supporting opposition.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  I must resolve all justifiable inferences in the non-moving party's favor.  Sommer v. Vanguard Group, 461 F.3d 397, 403 (3d Cir. 2006).  I may not consider evidence on a motion for summary judgment that would not be admissible at trial.  Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n.13 (3d Cir. 1999).  I may not weigh the evidence or make credibility

---

[5] On February 15, 2008, trial on the crossclaim was bifurcated from the trial of Ruggieri's claim against Quaglia.

determinations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc., 974 F.2d at 1363.

To defeat a motion for summary judgment, factual disputes must be both material and genuine. Anderson, 477 U.S. at 248. An issue is "material" if it is predicated upon facts that are relevant and necessary and that may affect the outcome of the matter pursuant to the underlying law. Id. An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248-49. Summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, because such a failure as to an essential element necessarily renders all other facts immaterial. Celotex Corp., 477 U.S. at 322-23. Thus, if there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, summary judgment must be awarded to the moving party. Anderson, 477 U.S. at 250.

III.   Discussion

  A.   Contribution and Indemnity under ERISA

Determining whether contribution and indemnity claims against non-fiduciaries are available under ERISA raises at least three nvoel legal questions: (1) whether a right to contribution and indemnity exists under ERISA; (2) if such a right exists, whether it can be brought against a non-fiduciary; and (3) whether ERISA preempts state law contribution and indemnity claims against non-fiduciaries. None of these issues has been resolved by the United States Court of Appeals for the Third Circuit.

Other courts disagree whether a fiduciary has a right to contribution and indemnity under ERISA. Compare, e.g., Chemung Canal Trust Co. v. Sovran Bank/Maryland, 939 F.2d 12, 18 (2d

Cir. 1991) (incorporating contribution and indemnity into law of ERISA), Free v. Briody, 732 F.2d 1331, 1337 (7th Cir. 1984) (same), Site-Blauvelt Eng'rs, Inc. v. First Union Corp., 153 F. Supp. 2d 707, 710 (E.D. Pa. 2001) (Joyner, J.) (right to contribution and indemnity among fiduciaries exists under ERISA's federal common law), and Cohen v. Baker, 845 F. Supp. 289, (E.D. Pa. 1994) (Giles, J.) (right to contribution exists under ERISA's federal common law), with, e.g., Travelers Cas. and Sur. Co. of Am. v. Iada Servs., Inc., 497 F.3d 862, 867 (8th Cir. 2007) (ERISA does not create right of contribution against another fiduciary), Kim v. Fujikawa, 871 F.2d 1427, 1432-33 (9th Cir. 1989) (no right to contribution under ERISA), Toledo Blade Newspaper Unions-Blade Pension Plan v. Inv. Performance Servs., 448 F. Supp. 2d 871, 875 (N.D. Ohio 2006) (ERISA does not permit a claim for contribution from co-fiduciaries), and In re Enron Corp. Sec. Derivative & ERISA Litig., 228 F.R.D. 541, 552 (S.D. Tex. 2005) (ERISA does not permit a contribution or indemnity claim against co-fiduciaries).[6]

---

[6] Courts finding a right to contribution and indemnity under ERISA reason that although Congress did not expressly provide for contribution or indemnity under ERISA, courts "are to develop a 'federal common law of rights and obligations under ERISA.'" Chemung Canal Trust Co., 939 F.2d at 15-16 (quoting Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989)). Principles of trust law guide courts in creating the federal common law. Id. Thus, ERISA provides for a right to contribution and indemnity because traditional trust law provided for such rights. Id. at 16. The courts note although the Supreme Court rejected the courts' authority to develop federal common law under antitrust and discrimination laws, the power to create federal common law is well established in the admiralty and labor relations laws. Chemung Canal Trust Co., 939 F.2d at 17.

Courts finding no right to contribution and indemnity under ERISA rely on the Supreme Court's unwillingness to recognize a federal common law right to contribution under federal discrimination and antitrust laws. See Travelers Cas. and Sur. Co. of Am., 497 F.3d at 864. Thus, "the statute's carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did not intent to authorize other remedies that it simply forgot to incorporate expressly.'" Id. (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 254 (1993)). They reason courts may adopt a common law principle under ERISA "only if necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in large by Congress." Id. at 865 (Bollman Hat Co. v. Root, 112 F.3d 113, 118 (3d Cir. 1997). These courts also note "implying a right to contribution is particularly inappropriate where . . . the party seeking contribution is a member of the class [e.g., fiduciaries] whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class." See Kim, 871 F.2d at 1432.

Similarly, courts disagree whether ERISA claims for contribution and indemnity can be brought against a non-fiduciary. Compare Petrilli v. Gow, 957 F. Supp. 366, 375 (D. Conn. 1997) (non-fiduciaries cannot be sued under ERISA for contribution or indemnity), Nat'l Elec. Benefit Fund v. Heary Bros., 931 F. Supp. 169, 191-93 (W.D.N.Y. 1995) (same), and Glaziers & Glassworkers Union Local 252 Annuity Fund v. Newbridge Sec. Inc., 823 F. Supp. 1191, 1194-95 (E.D. Pa. 1993) (Joyner, J.) (same), with, e.g., Daniels v. Bursey, 329 F. Supp. 2d 975, 981 (N.D. Ill. 2004) (federal common law supplementing ERISA permits a contribution claim against a non-fiduciary who knowingly participated in fiduciary's breach).

Resolution of claims involving non-fiduciaries also implicates Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 241 (2000) (Harris Trust). In Harris Trust, the Court held a participant, beneficiary, or fiduciary of a plan may bring a civil action against a nonfiduciary "party in interest" to a transaction barred by § 406(a) of ERISA. Id. at 241; see McDannold v. Star Bank, 261 F.3d 478, 486 (6th Cir. 2001) (Harris Trust limited any recovery against non-fiduciaries to "appropriate equitable relief" if the non-fiduciary knowingly participated in a fiduciary's breach and was a party-in-interest). Nevertheless, it is unclear what impact Harris Trust has on contribution and indemnity claims against non-fiduciaries under ERISA. Compare Daniels, 329 F. Supp. 2d at 980 (Harris Trust "dispelled the premise" on which the cases finding no right of contribution or indemnity against non-fiduciaries was based), with Clevenger v. Dillards, Inc., 712 F. Supp. 2d 832, 843 (S.D. Ohio 2006) (Harris Trust limited relief available to fiduciary from non-fiduciary to the equitable relief contemplated by 29 U.S.C. § 1132(a)(3), which does not include indemnity claims).

Even if a contribution or indemnity claim can be asserted against a non-fiduciary, however, the non-fiduciary is liable to a fiduciary only if it knowingly participated in the

fiduciary's breach.  See Harris Trust, 530 U.S. at 252 (non-fiduciary transferee liable under ERISA only if had actual or constructive knowledge of circumstances rendering the transaction unlawful); Daniels, 329 F. Supp. 2d at 981; Clevenger, 412 F. Supp. 2d at 844; McDannold, 261 F.3d at 486 (not determining whether an indemnity or contribution claim existed but noting a non-fiduciary would be liable only for knowing participation).

Moreover, courts further disagree whether ERISA preempts a state law contribution or indemnity action.  Compare, e.g., Travelers Cas. and Sur. Co. of Am., 497 F.3d at 867-68 (state indemnity and contribution claims against co-fiduciary preempted), Atrix Int'l v. Hartford Life Group Ins. Co., 2008 WL 151614, at *6 (D. Minn. 2008) (state law contribution claim preempted by ERISA), Wilmington Shipping Co. v. New England Life Ins. Co., 496 F.3d 326, 342 (4th Cir. 2007) (ERISA preempts state-law claims against non-fiduciaries if the claims relate to the plan), and Jones v. LMR Intern, Inc., 457 F.3d 1174, 1180 (11th Cir. 2006) (claim against non-fiduciary for failing to disclose ERISA plan had lapsed preempted because would upset the uniform regulation of plan benefits), with, e.g., Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp., 399 F.3d 692, 703 (6th Cir. 2005) (state law breach of contract and negligent misrepresentation causes of action against non-fiduciaries not preempted), Lewis v. Bank of Am. NA, 343 F.3d 540, 544 (5th Cir. 2003) ("Congress . . . did not intend to broadly immunize non-fiduciary parties . . . from liability under traditional state law contract and tort causes of action"), Airparts Co., Inc. v. Custom Benefit Servs. of Austin, 28 F.3d 1062, 1066 (10th Cir. 1994) (state law indemnity claim against non-fiduciaries not preempted), Clevenger, 412 F. Supp. 2d at 846 (state law indemnity claim against non-fiduciary not preempted by ERISA), and Samaritan Health

Ctr. v. Simplicity Health Care Plan, 459 F. Supp. 2d 786, 797-98 (E.D. Wis. 2006) (indemnity cross claim against non-fiduciary not preempted).[7]

Here, it is unclear whether ERISA or state law governs Quaglia's contribution and indemnity actions or if such actions are viable claims. See, e.g., Daniels, 329 F. Supp. 2d at 978-81 (discussing whether a claim to contribution and indemnity exists under ERISA and if such claim can be asserted against non-fiduciaries). I need not resolve these issues. PAS and Rosen are not fiduciaries, see 29 U.S.C. § 1002(21)(A), and Quaglia has not alleged PAS and Rosen knowingly participated in a breach of a fiduciary duty. Thus, even if an ERISA claim for contribution and indemnity exists, PAS and Rosen could not be liable under ERISA. See Daniels, 329 F. Supp. 2d at 981.

---

[7] ERISA preempts "any and all State laws" relating to an ERISA plan. Kollman v. Hewitt Assocs., LLC, 487 F.3d 139, 149 (3d Cir. 2007) (quoting 29 U.S.C. § 1144(a)). Although Congress intended the term "relate to" to be broadly interpreted, "preemption does not occur . . . if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661 (1995) (quoting Dist. of Columbia v. Greater Washington Bd. of Trade, 506 U.S. 125, 130 n.1 (1995)); accord Lewis v. Bank of Am. NA, 343 F.3d 540, 544 (5th Cir. 2003).

In Kollman, 487 F.3d at 150, the court found a plan participant's state malpractice claim against a non-fiduciary plan administrator was preempted because "adjudication of [plaintiff's] state law malpractice claim would necessarily require a court to consider the Plan in detail . . . to properly address" the arguments. The court, however, noted ERISA's preemptive scope did not "reach state law malpractice claims filed by ERISA plans or trustees because such claims do not undermine the congressional policies that underlie ERISA." Kollman, 487 F.3d at 149. The court noted a claim "an attorney, accountant, or other service provider was negligent does not 'relate to' the plan." Id. This is true even if the negligent act, which provided the basis for the malpractice suit, may have adversely affected the plan. Id. The court reasoned a plan's claim an agent's negligence caused injury to the plan "does not implicate the funding, benefits, reporting or administration of an ERISA plan." Id. The court contrasted the claim filed by the plaintiff, which was pre-empted, stating it went to the "essence of the function of an ERISA plan–the calculation and payment of benefits due to a plan participant." Id. at 150. To determine whether a calculation error was malpractice, a court would need to "consider the plan in detail . . . to properly address [the plaintiff's] arguments outside the mechanism prescribed by ERISA. Such an outcome is prescisely what Congress sought to avoid in developing a nationwide scheme for ERISA plans." Id.

12

In addition, if Quaglia's state law contribution and indemnity claims are not preempted by ERISA, Quaglia has failed to establish a genuine issue of material fact concerning PAS and Rosen's liability, and PAS and Rosen are entitled to judgment on the state law claims as a matter of law.  See 42 Pa. Cons. Stat. § 8321 (2008) (right to contribution); Exxonmobile Oil Corp. v. Lucchesi, 2004 WL 1699203, at *3 (E.D. Pa. July 29, 2004) (Hutton, J.) (right to indemnity).

B.   PAS and Rosen are not fiduciaries under ERISA

PAS and Rosen are not fiduciaries under ERISA.  See Confer v. Custom Eng'g Co., 952 F.2d 34, 39 (3d Cir. 1991).  A fiduciary, with respect to a pension benefit plan, is defined as someone who:

> (I) . . . exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) . . . renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) . . . has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Discretion is the "linchpin of fiduciary status under ERISA." Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 233 (3d Cir. 1994).  Parties hired to perform purely ministerial tasks are not fiduciaries under ERISA because they lack the requisite discretion.  Confer, 952 F.2d at 39.  Ministerial tasks include claim processing and calculation.  Id.

Quaglia admitted he was the trustee of the Plan and the Plan documents describe him as its administrator.  See Dep. Of Raymond J. Quaglia, at 92:10-11, 1-5; Summary Plan Description, at 1-2.  The Plan gives Quaglia the power to appoint an advisory committee, which has discretion to give distribution directions to Quaglia, a trustee.  See Summary Plan Description, at 2 ("[T]he Trustee will make all benefit payments from the trust fund to participants . . . .").  In a letter

13

describing the process for terminating the plan, Bluestein specified several times that Quaglia should not distribute the assets until the I.R.S. approved the termination.  See Dep. of Raymond J. Quaglia, at Ex. 34.  PAS and Rosen, however, merely calculated benefits and prepared tax filings.  See e.g., Dep. of Raymond J. Quaglia, Exs. 34-46; Reply Brief, at Ex. C.  Quaglia alleges Connor "promised to send the necessary letters for Quaglia to distribute Plaintiff's share . . . ."  Reply Brief, at 10 (citing Ex. C).  The handwritten letter, however, asks Quaglia to approve the calculated dollar amounts, at which time Connor would "begin the process of sending out the first letters to the participants."  Reply Brief, at Ex. C.  The letter does not state Connor would begin to distribute the funds to the Plan participants.  Rather, it simply informs Quaglia that Connor would begin the process of distributing information to the participants once Quaglia approved the amounts.  No evidence suggests PAS or Rosen performed anything more than ministerial tasks, precluding them from being deemed fiduciaries under ERISA.

      C.      <u>Contribution and indemnity under ERISA</u>

Even if, as some courts have suggested, non-fiduciaries owe a right of contribution or indemnity, see <u>Daniels</u>, 329 F. Supp. 2d at 980, the non-fiduciary must have knowingly participated in the fiduciary breach.  See <u>Harris Trust</u>, 530 U.S. at 246-47 (non-fiduciary parties in prohibited transactions liable only if knowingly participated in breach); <u>Daniels</u>, 329 F. Supp. 2d at 980.  Quaglia has offered no evidence PAS or Rosen knowingly participated in a breach of Quaglia's fiduciary duties.  The evidence establishes only that PAS and Rosen were prepared to begin the process of distributing letters to the participants upon receiving a directive and specific figures from Quaglia, the Plan's trustee and administrator.  Even assuming PAS and Rosen acted negligently in April 2006 by failing to begin the process of distributing information, they are not

liable under ERISA because they did not knowingly participate in a breach of Quaglia's fiduciary duty. See Harris Trust, 530 U.S. at 246-47; Daniels, 329 F. Supp. 2d at 980.

      D.      Pennsylvania state law claims

If Quaglia's state law contribution and indemnity claims are not preempted by ERISA, no genuine issue of material fact exists as to such claims, and PAS and Rosen are "entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

            1.      Pennsylvania state law contribution claim

In Pennsylvania, the right to contribution is governed by the Uniform Contribution Among Tort-feasors Act. 42 Pa. Cons. Stat § 8321 (2008). This right exists only among joint-tortfeasors. Id. at § 8324; IAP Worldwide Servs. v. UTi United States, Inc., No. 04-4218, 2006 WL 305443, at *12 (E.D. Pa. Feb. 8, 2006) (Savage, J.); U.S. Small Bus. Admin. v. Progress Bank (U.S. SBA), No. 03-3461, 2004 WL 2980412, at *10 (E.D. Pa. Dec. 22, 2004) (Giles, J.); Exxonmobil Oil Corp. v. Lucchesi, No. 03-1625, 2004 WL 1699203, at *4 (E.D. Pa. July 28, 2004) (Hutton, S.J.). "Joint-tortfeasors" are "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." IAP Worldwide, 2006 WL 305443, at *12; 42 Pa. Cons. Stat § 8322 (2008).

Quaglia, however, does not claim PAS and Rosen are joint-tortfeasors. To the contrary, he asserts they "are solely liable to Plaintiff and any other similarly situate[d] employee under the plan." See Amended Answer, at Crossclaims ¶ 49. Similarly, no evidence suggests Quaglia

established joint-tortfeasor status during the settlement with Ruggieri.[8]  Therefore, he is not entitled to contribution.  See Microvote, 320 F.3d at 450.

Accordingly, I grant summary judgment in favor of PAS and Rosen on Quaglia's state contribution claim.

###   2.   Pennsylvania state law indemnity claim

Indemnity "'is a right which [inures] to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation to another, and for which he himself is only secondarily liable.'"[9]  Exxonmobil, 2004 WL 1699203, at *3 (quoting Builders Supply v. McCabe, 77 A.2d 368, 370 (Pa. 1951)).  It is a "method of fault shifting, not sharing," to the party that is primarily liable.  Unique Tech. Corp. v. Micro-Stamping Corp., No. 02-6649, 2003 WL 21652284, at *3 (E.D. Pa. Apr. 15, 2003) (Davis, J.).  In addition, a settlement does not relieve the party seeking indemnity of its obligation to prove his case against the indemnitor; the indemnitee is still required to prove actual legal liability.  Exxonmobil, 2004 WL 1699203, at *3.

In Pennsylvania, indemnity shifts the entire loss from one party to another and is available under two circumstances: (1) where there is a contract to indemnify; or (2) where primary versus secondary or vicarious liability is present.  Nat'l R.R. Passenger Corp. v. URS Corp. (Amtrak),

---

[8] A settlement between the plaintiff and an alleged joint-tortfeasor is not, without more, sufficient to establish the settling party is a joint-tortfeasor.  Exxonmobil, 2004 WL 1699203, at *4.  The settling party can establish its joint-tortfeasor status through adjudication in another proceeding or by concession from the plaintiff in a release stating the settling party was a joint tortfeasor.  Rocco v. Johns-Manville Corp., 754 F.2d 110, 115 (3d Cir. 1985).  If the settling party seeking contribution does not establish he is a joint-tortfeasor, he is considered a volunteer and is not entitled to contribution from the non-settling party.  Mont. County v. Microvote Corp., 320 F.3d 440, 450 (2003); Rocco, 754 F.2d at 115; Exxonmobil, 2004 WL 1699203, at *4.  Even if the settling party establishes he is a joint-tortfeasor, he still must establish the party from whom he is seeking contribution is a joint-tortfeasor.  U.S. SBA, 2004 WL 2980412, at *11.

[9] Quaglia contends the indemnity crossclaim is not based on a duty PAS and Rosen owed to Ruggieri, but rather on a duty they owed to Quaglia.  See Reply Brief at 9.  However, where no contract to indemnify exists, indemnity would be allowed only if PAS and Rosen were primarily liable to Ruggieri.  Exxonmobil, 2004 WL 1699203, at *3.

528 F. Supp. 2d 525, 532 (E.D. Pa. 2007) (Baylson, J.).  The contract to indemnify can be either express or implied.  Agere Sys. Inc. v. Advanced Envtl. Tech. Corp., 552 F. Supp. 2d 515,  521 (E.D. Pa. 2008) (Davis, J.).  "A contract implied in fact is one where the parties assent to the formation of a contract, but instead of being expressed in words, the intention to infer obligation is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct."  Agere Sys., Inc., 552 F. Supp. 2d at 522 n.3 (quoting Highland Sewer and Water Auth. v. Forest Hills Mun. Auth., 797 A.2d 385, 390 (Pa. Comm. Ct. 2002)).  In an implied contract, if the indemnitee settles and the amount paid is reasonable, the payment is made in good faith, and the indemnitor receives notice of the settlement, the indemnitee still bears the risk of proving liability against the indemnitor.  See Ultramed, Inc. v. Beiersdorf-Jobst, Inc., 98 F. Supp. 2d 609, 611-12 (M.D. Pa. 1998); Daily Express, Inc. v. N. Neck Transfer Corp., 490 F. Supp. 1304, 1307 (M.D. Pa. 1980).

In the absence of a contract for indemnity, the party seeking indemnity must establish it is liable to the injured party, but its liability is secondary, or passive, compared to the primary liability of the party from whom it seeks indemnity.  Id.   For example, secondary liability exists where the relationship between the parties is one of employee and employer or principal and agent.  See Amtrak, 528 F. Supp. 2d at 532; McCabe, 77 A.2d at 370.  Vicarious liability exists when a principal or employer is liable for "acts of their agents or employees in the scope of their authority or employment.  Meyer v. Holley, 537 U.S. 280, 285 (2003) (citing Burlington Indus., Inc., 524 U.S. 742, 756 (1998)).  Once secondary or vicarious liability is established, the indemnitee, who was legally obliged to pay damages solely because of its legal status, may seek reimbursement from the party who is primarily liable.  Kirschbaum v. WRGSB Assocs., 243 F.3d 145, 156 (3d Cir. 2001).

      (a).    <u>PAS is not required to indemnify Quaglia</u>

PAS does not have a contractual duty to indemnify Quaglia.  Quaglia does not allege the existence of an express indemnification contract, <u>see</u> Amended Answer, at Crossclaims ¶¶ 49-50, and the Plan documents do not contain an indemnification clause, <u>see</u> Dep. of Raymond J. Quaglia, at Ex. 33; Summary Plan Description.  In addition, even if an implied contract existed for PAS to assist Quaglia in terminating the Plan and calculate participants' benefits, it was not an implied contract to indemnify Quaglia.  <u>Agere Sys., Inc.</u>, 552 F. Supp. 2d at 522 (even if defendant breached implied contract to dispose of waste in non-negligent manner, it would still be liable only for contract damages).

Because no contractual duty to indemnify exists, Quaglia  must establish he was secondarily liable to PAS because of his relationship to Ruggieri.  <u>Exxonmobil</u>, 2004 WL 1699203, at *3.  Quaglia asserts PAS's relationship to Quaglia constituted a principal/agent relationship, stating "PAS was the Quaglia['s] . . . agent to terminate the pension plan."  Reply Brief, at 10.  For an agency to exist, the principal must empower the agent to act for him, the agent must accept the undertaking, and the parties must understand the principal is in control of the undertaking.  <u>Jones v. ABN AMRO Mortg. Group, Inc.</u>, 551 F. Supp. 2d 400, 410 (E.D. Pa. 2008) (Giles, J.) (quoting <u>Basile v. H & R Block, Inc.</u>, 761 A.2d 1115, 1120 (2000)).

No evidence supports Quaglia's allegation PAS was an agent of Quaglia, or PAS and Quaglia had an employee/employer relationship.  No fee agreement or written agreement existed between the Quaglia and PAS specifying what services PAS would perform in the future.  See Dep. of Raymond J. Quaglia, at 90:7-10, 91:11-17.  Moreover, although PAS assisted Quaglia in terminating the Plan and calculating the participants' benefits, it did not undertake to distribute the benefits.  Rather, Quaglia was in control of that undertaking.

Thus, because the evidence does not suggest any genuine issue of material fact as to the relationship between Quaglia and PAS, PAS is not required to indemnify Quaglia.

>   (b).    Rosen is not required to indemnify Quaglia

Quaglia claims Rosen is required to indemnify him because Rosen is PAS's successor company.[10]  See Quaglia's Reply at 4.  Rosen was not PAS's successor, see Welcome Letter; Dep. of Raymond J. Quaglia, at 46:20-24, 47:1, and therefore, cannot be required to indemnify Quaglia.  Even if Rosen had assumed successor liability by taking over PAS's business, see Dep. of Raymond J. Quaglia, at 46:15-18; Reply Brief, at 13-14, Rosen owes no duty to indemnify Quaglia because PAS had no such obligation.

Although both Rosen and PAS were acquired by, and became wholly-owned subsidiaries of, NIM,  see Rosen Declaration, at ¶¶ 13-14, Rosen was not the "successor" of PAS, and did not assume PAS's responsibilities or liabilities, see Dep. of Raymond J. Quaglia, at 69:6-14.  The basic tenet of successor liability suggests a firm that buys another firm's assets does not assume the seller's liabilities merely by purchasing its assets.  Berg Chilling Sys. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. 2006).  Exceptions to assuming successor liability include when the new corporation is a restructured form of the old or when a transaction factually amounts to a consolidation or merger.  Id. at 465.  For these exceptions to apply, however, the successor company must purchase the assets of the seller corporation.  Id.

Rosen did not purchase PAS's assets or liabilities.  Neither the April 10, 2006 letter from Bluestein to Quaglia, nor the letter from Rosen to Quaglia welcoming Quaglia to the Rosen firm, suggested Rosen purchased PAS's assets or assumed its liabilities and responsibilities.  See Dep. of Raymond J. Quaglia, at Ex. 32.  This evidence is corroborated by the declaration of Rosen,

---

[10] Quaglia did not contract with Rosen and did not retain him.  See Dep. of Raymond J. Quaglia, at 46:14-18.

19

which states "Rosen is in no way a 'successor' in any interest to PAS nor did it assume any duties owed by PAS to any other party or any of its assets."  See Rosen Declaration, at ¶ 14.  Quaglia, however, properly noted PAS and Rosen identified Rosen as PAS's "partner."  See Reply Brief, at 4.  In the April 10, 2006 letter, Bluestein refers to Rosen as one his "two Philadelphia partner pension firms."  See Dep. of Raymond J. Quaglia, at Ex. 32.  Additionally, in the Welcome Letter, Rosen stated PAS was one of Rosen's "several strategic partners in a consolidated organization known as National Investment Managers, Inc."  See id.  Notwithstanding the use of the word "partner," PAS and Rosen's relationship was limited to the fact they were both acquired by NIM.  Therefore, Rosen was not PAS's successor.

III.    Conclusion

PAS and Rosen established no genuine issue of material fact exists and they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 5(c).  Quaglia failed to set forth "specific facts showing a genuine issue for trial" to support the crossclaims for contribution and indemnity.  See Fed. R. Civ. P. 56(e)(2).  Accordingly, I grant PAS and Rosen's motion for summary judgment on Quaglia's contribution and indemnity claims.

An appropriate order follows.